Robert R. Tanner and Susan S. Tanner v. Commissioner.
Tanner v. Commissioner
Docket No. 83893.
United States Tax Court
T.C. Memo 1962-123; 1962 Tax Ct. Memo LEXIS 185; 21 T.C.M. (CCH) 646; T.C.M. (RIA) 62123; May 23, 1962
*185 Simon Presant, Esq., for the petitioners. Clarence M. Dunnaville, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1955 in the amount of $254.11. The sole issue for decision is whether petitioners are entitled to a deduction of a nonbusiness bad debt in the amount of $2,162 in the year 1955. Findings of Fact Petitioners, husband and wife now residing in New Philadelphia, Ohio, during the taxable year 1955 resided in Westport, Connecticut. They filed a joint Federal income tax return for the year 1955 with the district director of internal revenue at Hartford, Connecticut. Robert R. Tanner (hereinafter referred to as petitioner) is and has been since at least 1951, a corporate business executive. Petitioner's sister, Betty Tanner Aaron (hereinafter referred to as Betty), married Arthur A. Aaron (hereinafter referred to as Aaron) in 1935. Betty and Aaron had three children, the oldest born in 1938, and the youngest in 1946. Betty and Aaron were divorced in 1948. After this divorce Aaron was obligated to make certain payments to Betty for *186 her support and support of their three minor children. Aaron was an attorney-at-law, and during the year 1950 and subsequent thereto he had an office in the same suite occupied by petitioner and petitioner's father, Wilson P. Tanner. Betty and her three children during the years 1951 through 1953, lived in the home of petitioner's mother which was about 5 miles from where petitioners lived during those years. Around Christmastime of 1950 Aaron asked petitioner if he could help him out by lending him some money to assist in the support of Betty and their three children. Aaron stated that he was running low on money. Petitioner told Aaron that he was to be married shortly but that he could provide Betty with a little money each week. Petitioner had no understanding with Aaron, either as to the period of time during which he would make advances to Betty or as to when Aaron would repay such advances to petitioner. There was no agreement between Aaron and petitioner as to the precise amount Aaron would pay to Betty each week or as to his making the payments every week or as to the period of time during which petitioner would continue to make such payments. Beginning in early 1951 *187 and continuing through July 1953, petitioner advanced to his sister Betty in each week, with the exception of seven weeks, the sum of $18. Petitioner would hand the money in cash to his sister when he happened to see her during the week. During the years 1951 through 1953, he maintained a checking account but did not make the advances to his sister by checks. During the years 1951 through 1953, Betty had very little money. During this period petitioner occasionally gave his sister or her children money aside from the $18 per week. Petitioner considered these additional amounts as gifts to his sister. During the time that petitioner was advancing $18 a week to Betty, he did not know what was the amount of Aaron's income. Petitioner never received a note or any other written document evidencing any indebtedness owed by Aaron to him on account of the advances of $18 a week to Betty during 1951 through July 1953. Petitioner ceased advancing the $18 a week to Betty because of his wife's unwillingness for him to continue "giving away part of" his salary. Petitioner informed Aaron in late July or early August that he could not continue making the $18 weekly advances and drafted the *188 following notation: Artie: 8-7-53 I figure I have advanced for the benfit [benefit] of your children and ex $18.00 per week for a period of 128 weeks or a total of $2304.00 less $16.00 which you have given to me making a net of $2288.00. This covers the period between the last week of January 1951 and the last week of July 1953. There was period of approximately 7 weeks when Betty did not get the above so deduct $126.00 making a total of $2162.00. This notation is typewritten and at the bottom thereof in handwriting appears the following: Approved 8/7/53 Arthur A. Aaron. The written signature is Aaron's. During the time that petitioner was making the $18 weekly advances to Betty he, on a number of occasions, asked Aaron to return the money to him. The only amount that Aaron ever returned was $16. During the years 1951 through 1954, Aaron had an arthritic condition which was getting progressively worse. He died on February 8, 1955. Petitioner filed a claim for $2,162 with the administratrix of Aaron's estate. Petitioner received no payment on his claim and was informed by the administratrix that there was no money in the estate. The only asset shown in Aaron's estate *189 in the appraisal thereof filed in the Probate Court of the district of Norwalk, Connecticut, was an automobile valued $750at, which was shown as having been sold at that price, raising insufficient funds to pay the funeral and administrative expenses of the estate. In the year 1953 Arthur A. Aaron received income in the sum of $850, and in 1954, he received income in the amount of $665. Petitioner reported in his 1955 income tax return a long-term capital gain of $46.99 and a capital loss from a bad debt due from Aaron of $2,162, with a resulting net capital loss of $2,115.01 of which he deducted $1,000 in computing his taxable income. Respondent in his notice of deficiency disallowed the claimed deduction of $1,000 as a capital loss and in addition increased petitioner's income by $23.50 representing one-half of the capital gain which had been offset against the capital loss as claimed on petitioner's return with the following explanation: (a) and (b) It is held that the short term capital loss of $2,162.00 claimed by you as a non-business bad debt on account of an alleged loan made to Arthur A. Aaron, is not allowable on the following grounds: (a) Failure to substantiate *190 the amount of claimed advances. (b) No bona fide debt was created. (c) The alleged loan had no value as of January 1, 1955 and was therefore worthless in a preceding year or years. As a consequence of the above, income is increased as follows: Capital loss claimed on
your return, disallowed
$1,000.00
Add: Long-term capital
gain, Easy Washing
Machine
$46.99
Less: 50% pursuant to
Section 1202
23.49
Net long-term capital gain
$ 23.50
Total increase in income
$1,023.50
Opinion It is respondent's position that petitioner has failed to substantiate that he advanced $2,162 to his sister, Betty; that if petitioner did advance the $2,162, such amount was not a bona fide indebtedness from Aaron to petitioner; and that in any event petitioner has failed to show that if such an indebtedness did exist, it did not become worthless prior to January 1, 1955. We agree with petitioner that he has introduced sufficient evidence to show that he made advances to his sister during the years 1951 through July 1953 in a total amount of $2,162. However, there remain the questions whether the amount of these advances constituted a bona fide indebtedness of *191 Aaron to petitioner, and if so, did the debt become worthless prior to January 1, 1955. A prerequisite for a bad debt deduction is that a debt must have an existence in fact, and the evidence must clearly show that the intention of the parties was to create a debtor-creditor status. In cases of inter-family transfers of money, such transactions are subject to close scrutiny. , affirmed per curiam (C.A. 2, 1951). Viewing the evidence herein as a whole, we do not consider that petitioner has borne the burden of showing that the advances he made to his sister were in fact bona fide loans to Aaron. While petitioner may have hoped that some day Aaron would be able to repay him the $18 a week advances which petitioner made to his sister and may have felt that Aaron would make such repayment if he became successful in some business ventures, we do not believe that at the time the advances were made, petitioner had a reasonable expectation, as distinguished from hope, of ever being repaid. Under these circumstances, the advances were more in the nature of gifts to petitioner's sister than loans *192 to Aaron. Cf. . The evidence here shows that petitioner advanced the money to his sister without any understanding with Aaron as to how much he would advance each week, the length of time during which he would make the advances, or when Aaron would repay him. Aaron told petitioner he was "low on cash" when asking petitioner to make the advances, but petitioner made no investigation of Aaron's income. At the time petitioner's sister was living with their mother. She had three children, the oldest being only 12, and very little money. Petitioner stopped making the advances in 1953 because his wife objected to his "giving away part of" his salary. Aaron gave petitioner no note or other written evidence of indebtedness when the advances were made. There is no evidence that petitioner had any agreement with Aaron as to the payment of interest. Petitioner testified that he had heard discussions of Aaron's having some affiliation with a mining company during the years 1951 through 1954 but did not know anything about the nature of the company's business other than what he heard in these discussions. Petitioner testified that he asked Aaron *193 on a number of occasions to repay the advances but Aaron never repaid but $16. When petitioner was asked why Aaron gave him the $16 he said, "Well, it was what I caught him with one day." Petitioner, nevertheless, continued to make advances to his sister until July 1953. Petitioner cites a number of cases in which interfamily loans have been recognized as giving rise to a bad debt deduction, typical of which is , affd. (C.A. 9, 1930). The evidence in , showed that the taxpayer therein knew at the time the loans were made that his brother's financial condition was good and that he had been employed at a substantial salary. The evidence in that case further showed that the taxpayer had made prior loans to his brother which had been repaid. Here the evidence shows that petitioner did not know Aaron's financial condition and continued to make advances to his sister even though he was not repaid. The instant case is distinguishable on its facts from Since in our view no bona fide loan by petitioner to Aaron existed, it is unnecessary to *194 pass upon respondent's further contention that if any such loan in fact existed, it became worthless prior to January 1, 1955. Decision will be entered for respondent.